2023 IL App (2d) 220103
No. 2-22-0103
Opinion filed June 14, 2023

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 19-CF-1004 |
| ROBERT A. COX, | ) ) | Honorable Salvatore LoPiccolo Jr., |
| Defendant-Appellee. | ) | Judge, Presiding. |

PRESIDING JUSTICE McLAREN delivered the judgment of the court, with opinion.
Justices Hutchinson and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1     Pursuant to Illinois Supreme Court Rule 604(a)(1) (eff. Jan. 1, 2023)) the State appeals from the trial court's orders granting the motion to suppress evidence of defendant, Robert A. Cox, and denying the State's motion to reconsider. We affirm.

¶ 2                                   I. BACKGROUND[1]

_____

[1]The State argues that this court should strike in whole or in part defendant's statement of facts for various infractions of Illinois Supreme Court Rule 341 (eff. Oct. 1, 2020). We do not find that the alleged flaws are so serious that they interfere with our ability to understand and adjudicate

¶ 3     On May 23, 2019, officers from the Aurora Police Department executed a search warrant at 942 Oliver Street in Aurora. Defendant, who did not live at that address and was not a subject of the warrant, was present outside the house with several other people when officers arrived to execute the warrant. Defendant, along with the others, complied with police orders to get on the ground; all were handcuffed behind their backs then helped up to a standing position.

¶ 4     Eventually, Investigator Chris Converse performed a pat-down search of defendant during which Converse stated that he thought that he felt an object in defendant's buttocks. Defendant was then taken by squad car to the Aurora Police Department, then to the Kendall County jail, where a "body scan" revealed an unknown object in the area of defendant's buttocks. Officers then began a strip-search of defendant. However, defendant became uncooperative during the strip search and was ultimately given an orange jumpsuit to wear. During Converse's ensuing search of defendant, Converse stated that he felt an object and was able to work it down defendant's pant leg. He recovered a plastic bag containing a white substance.

¶ 5     Defendant was ultimately charged by indictment with one count each of unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(c)(2) (West 2018)) and unlawful possession of a controlled substance (*id.* § 402(c)). Defendant filed a motion to suppress evidence, contending that the searches of his person exceeded the proper scope of a pat-down for weapons under the federal and state constitutions and that the officers never found any reasonable, articulable justification for broadening the scope of a pat-down for weapons.

---

this case. However, we will ignore any material that is noncompliant with supreme court rules or that is unsupported in the record. See *State Farm Mutual Automobile Insurance Co. v. Burke*, 2016 IL App (2d) 150462, ¶ 22.

¶ 6     At the hearing on defendant's motion, Investigator Collin Griffin of the Aurora Police Department testified that he assisted in the execution of the warrant in question. Some officers remained with Griffin outside the house, while others went inside. Griffin saw two vehicles and three people, including defendant, in the driveway at 942 Olive Street. Officers ordered the people to get on the ground; all complied. Griffin handcuffed all three behind their backs. At some point, an unknown officer helped all three to a standing position.

¶ 7     Griffin eventually saw Converse perform a pat-down search of defendant. His attention was drawn to the search when he heard voices escalate in the direction of the search; he saw defendant take his hands off the hood of the squad car and try to turn around toward the nearby officers. Griffin was unsure if defendant was handcuffed at that point, but he did not see anyone uncuff him. While he "couldn't see exactly" what Converse was doing, he described Converse's pat-down as "open hand, outside of the clothing Mr. Cox was wearing," particularly when Converse was in the "general area" of defendant's buttocks. Converse eventually stated that he thought that he felt an object in defendant's buttocks. Griffin did not see anyone else perform a pat-down of defendant. He also never heard Converse "say something to the effect of he's got it cuffed." Griffin, along with Converse and Investigator Gregory Christoffel (and Sergeant Alfredo Dean in another car) took defendant to the Aurora Police Department.

¶ 8     Defendant testified that he was in the driveway at the home of his friend Maulvi Bey with some other acquaintances when police pulled in the driveway in an unmarked car and ordered them at gunpoint to get on the ground. Defendant and the others obeyed the order. Defendant was handcuffed, helped up from the ground, and patted down by an unknown officer. The officer used an open hand over defendant's clothing and did not find a weapon or anything else on him.

¶ 9    After a few moments, during which defendant remained handcuffed in the driveway, an officer, whom defendant later learned was Converse, came out of the house, walked toward defendant, and asked defendant if he remembered him. Converse asked the unidentified officer if he had patted down the people in the driveway and specifically asked if he had patted down defendant. When told yes, Converse walked to defendant, said, "He got it cuffed," and began to pat down defendant while defendant was still handcuffed behind his back. After Converse did a "[r]egular" pat-down, he pulled defendant's clothes "up real tight" and proceeded to use his open hand and "place all four of his fingers between" defendant's buttocks. He also tried to "put one or two fingers at a time" between defendant's buttocks, causing defendant pain. Defendant began to squirm, "trying to stop him from doing it because he's like trying to penetrate me." Other officers grabbed and held defendant; this search of defendant's buttocks lasted "[m]aybe like probably two minutes or whatever."

¶ 10    Defendant then testified that Converse said, "Sarge, I felt it. Let's take him with us." Officers then switched his handcuffs to the front, and Converse took defendant's phone and money out of his pockets. Three officers, including Converse, drove him to the Aurora Police Department.

¶ 11    Christoffel testified that he and Griffin were assigned to pull into the driveway and detain anybody who was in the driveway. They arrived at about 8:15 p.m. He directed the three individuals in the driveway to get on the ground and handcuffed one man. He did not handcuff or pat down defendant, and he did not know who did handcuff him. He did not see anyone else, including Converse, pat down defendant in the driveway. Two cars, both registered to defendant, were located in the driveway. Christoffel, Converse, and Griffin drove defendant to the police station.

¶ 12    Converse testified that he had received training in conducting pat-down searches and had performed several thousand such searches in his career. He had conducted pat-downs in which he had felt objects "inconsistent with human anatomy," including firearms and other weapons. He had located items in a detainee's "buttocks area" approximately 100 times and had found weapons in subjects' "crotch and buttocks area." The buttocks area was a common area in which people transported narcotics, and he had often found narcotics there.

¶ 13    Converse participated in the execution of the search warrant, assisting with surveillance. He knew that defendant was the subject of previous narcotics investigations, and he saw that defendant was present on the property before the search warrant was executed. Defendant was frequently present at the location, and his presence heightened the safety concerns of the officers.

¶ 14    Converse then was part of the entry team going into the house. When he came back out, defendant was standing near the unmarked squad car in the driveway. Converse did not know who had handcuffed defendant or if anyone had patted him down. Converse then patted down defendant, using an open-hand technique. When he patted down defendant's buttocks area, he "felt a hard foreign object move in between [defendant's] butt cheeks" that he "knew to be contraband," based on his training and experience. He could feel the object without penetrating deep within the buttocks. He had his hands together in a "bladed position," and he put them "just in between his butt cheeks," using an up-and-down motion from defendant's crotch to his back. He did not attempt to put his fingers in defendant's anus, and he had never recovered narcotics from someone's anus. Defendant never informed him that he was hurting defendant, but defendant "attempted to close his legs, clench his buttocks, and turn away" to prevent Converse from retrieving the item. Converse attempted to retrieve the item from the outside of defendant's clothing, but it was then decided to take defendant to the police station.

¶ 15    The trial court found that both the initial detention of defendant in the driveway and Converse's decision to pat down defendant to search for weapons were reasonable. However, the executed pat-down exceeded the scope of a frisk for weapons. Converse did not merely pat down the outside of defendant's clothing looking for weapons; by placing his hands together in a "bladed position" and running them between defendant's buttocks from defendant's crotch to his back, Converse performed a search that was more intrusive than a pat-down frisk for weapons. The court found that the purpose of Converse "running his hands between the butt cheeks of the defendant was to dislodge any object that the defendant may have concealed between his butt cheeks," not to locate a weapon in between defendant's buttocks. Converse's search in the driveway was "akin to a search incident to a lawful arrest," but Converse lacked probable cause to believe that defendant was engaged in criminal behavior prior to the search. Therefore, the court granted defendant's motion to suppress. The court subsequently denied the State's motion to reconsider, and this appeal followed.

¶ 16                              II. ANALYSIS

¶ 17    The State contends that the trial court erred in granting defendant's motion to suppress evidence. In reviewing a trial court's ruling on a motion to suppress evidence, we review the trial court's findings of historical fact only for clear error, giving due weight to any inferences drawn from those facts by the fact finder. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). We grant great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence. *Id.* We remain free to undertake our own assessment of the facts in relation to the issues, and we may draw our own conclusions when deciding what relief should be granted. *Id.* Thus, we review *de novo* the trial court's ultimate legal ruling as to whether suppression is warranted. *Id.*

¶ 18    Both the fourth amendment to the United States Constitution and the Illinois Constitution of 1970 guarantee the right of individuals to be free from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. Our supreme court has explained that "[t]he essential purpose of the fourth amendment is to impose a standard of reasonableness upon the exercise of discretion by law enforcement officers to safeguard the privacy and security of individuals against arbitrary invasions." (Internal quotation marks omitted.) *People v. Colyar*, 2013 IL 111835, ¶ 31.

¶ 19    In *Terry v. Ohio*, 392 U.S. 1 (1968), the United States Supreme Court held that a brief investigatory stop, even in the absence of probable cause, is reasonable and lawful under the fourth amendment when the totality of the circumstances reasonably leads the officer to conclude that criminal activity may be afoot and the subject is armed and dangerous. *Terry*, 392 U.S. at 30; *Colyar*, 2013 IL 111835, ¶ 32. Our supreme court follows *Terry* and adheres to its standards when reviewing the propriety of investigatory stops under the Illinois Constitution. *Colyar*, 2013 IL 111835, ¶ 32. Pursuant to *Terry*, a police officer may also " 'tak[e] steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.' " *Id.* ¶ 34 (quoting *Terry*, 392 U.S. at 23).

¶ 20    However, the government's interest in a police officer's need to protect himself from danger must be balanced with the fourth amendment rights of a citizen to be free from unreasonable searches and seizures. *Id.* ¶ 35. Therefore, law enforcement officials are afforded a narrowly drawn authority to permit a reasonable search for weapons when the officer has reason to believe that the subject of his investigation is armed and dangerous. *Terry*, 392 U.S. at 27; *Colyar*, 2013 IL 111835, ¶ 35. An officer is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons that might be used to assault him. *Terry*, 392 U.S. at 30-31; *Colyar*, 2013 IL 111835, ¶ 37. The sole

justification for such a search under the *Terry* exception is the protection of the officer and others in the vicinity, not to gather evidence. *People v. Sorenson*, 196 Ill. 2d 425, 432 (2001). The limitations of such a search "must be developed in the concrete factual circumstances of individual cases" but must in general "be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 29. A search that goes beyond a pat-down search limited to determining whether a defendant is armed is not justified under *Terry*. *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993); *People v. Kowalski*, 2011 IL App (2d) 100237, ¶ 12. However, if an officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity as a weapon or contraband immediately apparent, there is no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons, and the object may be seized. *Dickerson*, 508 U.S. at 375-76; *Kowalski*, 2011 IL App (2d) 100237, ¶ 12.

¶ 21     Defendant does not dispute that officers were justified in performing a protective pat-down for weapons on the individuals, including himself, standing in the driveway when the warrant was being executed. However, defendant argues, and the trial court found, that Converse's search of defendant exceeded the scope of a *Terry* frisk for weapons. The State now argues that Converse's search was reasonable under the circumstances to confirm whether defendant possessed a weapon and, thus, complied with the fourth amendment.

¶ 22     The State first cites one out-of-jurisdiction federal trial court case and two unpublished Illinois cases (pursuant to Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023)) to inform us that weapons can be found in crotch and buttocks areas of a subject's pants. This is noncontextual and anecdotal, at best. None of the cases involved weapons found between the subject's buttocks. We are aware that

weapons can be found in the pants of defendants, but the search at issue here was much more specific and intrusive than the searches in those cases, and the cases are of little value.

¶ 23    The State then argues that Converse's training and experience in narcotics enforcement established that "subjects—and particularly ones involved with narcotics—consider the location suitable to conceal items from the police."[2] Thus, according to the State, defendant's prior involvement in narcotics investigations and his link to a location where drug sales had occurred "contributed to [Converse's] determinations that a weapon may be concealed where he searched under the specific facts of this case." We disagree. The evidence in this case indicates that Converse's *objective* intent was a search for contraband, not a search for weapons. Converse testified that he had located items in a detainee's "buttocks area" approximately 100 times and had found weapons in subjects' "crotch and buttocks area." Converse did not testify that he had found weapons between subjects' buttocks. The crotch is easily searched with an open-hand pat-down and does not require bladed-hands inserted between buttocks. The "buttocks area" is a nebulous phrase; it could include the back pockets of a subject's pair of jeans. The only common use of the "buttocks area" that Converse testified to was to transport narcotics, and he had often found narcotics there. Converse had plenty of training and experience in finding narcotics between buttocks, but none in finding weapons between buttocks.

¶ 24    The State relies heavily on *United States v. Robinson*, 615 F.3d 804 (7th Cir. 2020) to support its position. In *Robinson*, the defendant was a passenger in a car that was pulled over on suspicion that the driver had no license. The police officer looked into the car and saw the defendant "squirming around oddly" with a folded pocketknife visible in his front left pocket. The

---

[2]Presumably, the "location" is the area between the buttocks.

officer took the knife and noticed a white residue on it. *Id.* at 805. During the subsequent pat-down search, the defendant straightened out and tightened his muscles; the officer briefly felt something hard near the defendant's backside, but then he lost the object; he did not know at that time what the object was, but he thought it was not a weapon. *Id.* The officer then stopped the pat-down, briefly searched the car, and talked to two women (including the defendant's sister) who had stopped at the scene. The search of the car revealed a small scale with white residue. The officer then handcuffed the defendant and resumed his pat-down, "in part to follow up on the hard object he had already detected." *Id.* After detecting a hard object wedged in the defendant's buttocks, the officer took the defendant to the ground, handcuffed one of the women, then pulled a bag of crack from the defendant's clenched buttocks. *Id.*

¶ 25    In affirming the trial court's denial of the defendant's motion to suppress, the appellate court held:

> "[Officer] Pulver was not satisfied with his initial effort to pat down Robinson, and so he was entitled to return to finish the job within the bounds outlined in *Terry*. Finally, just because he indicated after the fact that his initial impression was that the hard object he felt for an instant during the first phase was not a weapon, objectively speaking something hard might have been harmful, and Pulver was entitled to assure himself that his first impression was correct." *Id.* at 808.

¶ 26    We first note that, as *Robinson* is a federal circuit court decision, it is persuasive, not binding, on our state courts. *See Mekertichian v. Mercedes-Benz U.S.A, L.L.C.*, 347 Ill. App. 3d 828, 835 (2004). Thus, the State's complaints that the trial court "failed to consider" and "did not properly consider" certain aspects of the *Robinson* decision are less than compelling, as is its assertion that "the circuit court's disregard of *Robinson* was error." *Robinson* is distinguishable

from the case before us; it did not involve a claim that the *method* of the search of the defendant's buttocks was itself evidence that the search exceeded the bounds of a proper *Terry* search for weapons. *Robinson* was concerned with the fact that the search was broken up by other concerns that the officer attended to. Further, the defendant in *Robinson* had already been found in possession of a pocketknife that also contained evidence of narcotics. Here, the issue was how Converse searched in between defendant's buttocks when defendant was merely present at the execution of a search warrant. Converse's search between defendant's buttocks with bladed hands had all the hallmarks of a search for contraband, not the hallmarks of a search for weapons, to ensure officer safety.

¶ 27    The State asserts that "[t]o disallow searching for weapons where they could be found would offer guidelines on how to effectively hide weapons from the police and undermine the purpose of conducting protective searches entirely." This is hyperbole. The State cites no cases where weapons were found between a defendant's buttocks. Even Converse, with his extensive training and experience in pat-downs, did not testify that he had ever found a weapon concealed between a subject's buttocks. He merely testified that he had found weapons in subjects' "crotch and buttocks area," never specifying the recovery of weapons from between a subject's buttocks and expanding the recovery zone to include the crotch and the nebulous "buttocks area." Instead, Converse testified that the buttocks area was a common area in which people transported narcotics and that he had often found narcotics there. Converse's search was designed simply to find contraband, not weapons. It did not fit the raised justification of officer safety; it was not "an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 29. As such, it was not objectively reasonable.

¶ 28    We agree with the trial court that Converse's search of defendant in the driveway exceeded the scope of a *Terry* frisk for weapons and was more akin to a search incident to a lawful arrest, seeking to find any object that defendant may have concealed between his buttocks. Converse had experience finding contraband, not weapons, hidden in such a location, and used the opportunity to try to find contraband on defendant, a known subject of narcotics investigations. The search of defendant and the subsequent recovery of contraband from defendant's person were improper, and the trial court did not err in granting defendant's motion to suppress.

¶ 29                              III. CONCLUSION

¶ 30    For these reasons, the judgment of the circuit court of Kane County is affirmed.

¶ 31    Affirmed.

---

### *People v. Cox*, **2023 IL App (2d) 220103**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 19-CF-1004; the Hon. Salvatore LoPiccolo Jr., Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Max C. Boose, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Geneva L. Penson, of Aurora, for appellee. |

---